[Civ. No. 18677. Fourth Dist., Div. One. June 18, 1980.]

JAMES O. HEWITT et al., Plaintiffs and Respondents, v.
RINCON DEL DIABLO MUNICIPAL WATER DISTRICT,
Defendant and Respondent;
CITY OF ESCONDIDO, Defendant and Appellant.

COUNSEL

Elroy F. Wiehl, City Attorney, Jennings, Engstrand & Henrikson, Paul D. Engstrand, Larry L. Marshall, Wallace R. Peck and Thomas Lundmark for Defendant and Appellant.

Joseph L. Marshall and David N. Aitken for Plaintiffs and Respondents.

No appearance for Defendant and Respondent.

OPINION

**HAMRICK, J.***—The petitioners James O. Hewitt and other named individuals (Hewitt) are taxpaying landowners and water users within the Rincon del Diablo Municipal Water District (Rincon). Rincon is a public agency organized in 1954 under the provisions of the Municipal Water District Law of 1911, and originally included lands located outside the boundaries of the City of Escondido (City). Because of annexations to the City, certain lands now lie within both Rincon and the City. However, a major portion of Rincon's territory still remains outside City's boundaries. For many years, City has owned and operated its own municipal water system. Prior agreements between City and Rincon have provided for certain interconnections between the two water systems and for the allocation of designated primary service areas for each competing district. These prior agreements have given rise to past litigation.

---

. *Assigned by the Chairperson of the Judicial Council.

In July 1972, City and Rincon entered into an "Operational Merger Agreement," the immediate object of which was to settle a pending lawsuit. The long-range objective was to fully merge their respective water systems by interconnections into a single system, with the City being its exclusive operator, thereby eliminating duplication of costs with the hope of improving water service for all users. Before "full merger" as contemplated by the agreement, each party is obligated to undertake certain improvements and activities which included Rincon's connecting its system to the Vista flume.

Hewitt originally brought this action seeking to prevent Rincon from constructing the interconnection with the Vista flume and also for declaratory relief as to the validity of the merger agreement. The Vista flume interconnection project, however, was eventually shelved and this action is now limited to the validity of the merger agreement. Rincon now joins with Hewitt in attacking the validity of the 1972 agreement.

The questioned validity of the operational merger agreement has to do with its final phase and those provisions which deal with the rights and duties of the parties after "full operational merger" occurs. The parties conceded the agreement is not severable and, therefore, if these provisions are invalid, the entire agreement is invalid.

Full operational merger is defined in the merger agreement as follows:

*"Full Operational Merger*

"The management and operation by the City, pursuant to the terms of this Agreement, of both the Rincon and City systems as a single integrated water system, and including the collection and expenditure of all funds in connection therewith." (Exhibit 1, sec. II(f).)

The provisions applicable after full operational merger has occurred appear in section VI, paragraphs 19 through 26.[1]

---

[1]Paragraphs 19 through 26 read:
"19. *Implementation of Merger*. When all of the foregoing conditions have been met, arrangements shall be made by the administrative officers of the parties for reading all Rincon meters. This shall be done at the end of month in which the full operational merger occurs, unless the parties shall work out a different time schedule. All charges for water delivered by Rincon prior to the time such meters are read, and all accounts receivable owed to Rincon at such time, shall remain the property of Rincon, and shall be included in future billings of the City for remittance to Rincon. After

The basic issue involved is whether the merger agreement amounts to an improper delegation of legislative power by Rincon to City.

■ Municipal water districts are characterized as quasi-municipal corporations and, as such, have a broad grant of legislative policy-making power (*Henshaw* v. *Foster* (1917) 176 Cal. 507 [169 P. 82]; *Yribarne* v. *County of San Bernardino* (1963) 218 Cal.App.2d 369 [32 Cal.Rptr. 847]). The doctrine prohibiting the delegation of legislative power is well established in California. Two Supreme Court cases cited in the briefs of both parties as the leading decisions in this area are *Kugler* v. *Yocum* (1968) 69 Cal.2d 371 [71 Cal.Rptr. 687, 445 P.2d 303], and *Bagley* v. *City of Manhattan Beach* (1976) 18 Cal.3d 22 [132 Cal.Rptr. 668, 553 P.2d 1140].

---

such meters have been read, all revenues from such users, and from other water service provided by the City under the terms of the full operational merger, shall belong to the City.

"20. *Service to Rincon Area.* When the full operational merger has occurred, the City shall assume the obligation of providing good water service to all lands and inhabitants within the boundaries of Rincon as they then exist, pursuant to the City's ordinances, rules, and regulations, except as they may be modified by the terms of this Agreement.

"21. *Water Rates and Charges.* The City shall adopt a uniform system of water rates, rate blocks, and charges which shall apply equally within Rincon and the City. Water rates and charges shall not be higher than necessary to raise the amounts required to properly operate and maintain the combined City and Rincon systems; to provide for necessary improvements and expansion, including the facilities designated as Phase II on Exhibit 'A'; and to service Rincon's Improvement District No. 1 bonds, Rincon's reimbursement agreements, bonds of the City issued for construction of the Treatment Plant, improvement of its water system, or acquisition of the Escondido Mutual Water Company system, and any other debt incurred for the purpose of constructing or installing water system facilities. It is the intent of the parties that such water rates and charges be used for the above purposes only, and not to finance any other City functions, since many water users may be outside of the boundaries of the City. Nothing in this Paragraph shall limit the ability of the City to impose a utility users tax, including a tax upon water use, within the City. The term 'water rates and charges' as used in this Paragraph shall not include the net power revenues of the City or any revenues received by the City from recreational activities at Dixon Reservoir and Lake Wohlford.

"22. *Service Outside City.* The City shall not make any special or higher rates, charges, or conditions of service applicable to users within Rincon who are located outside the City which are different from those applicable within the City. Nor shall the City require annexation to the City as a requirement of providing water service.

"23. *Existing Rincon Debt.* The City shall pay to Rincon sufficient funds to amortize its Improvement District No. 1 bonds, and meet its obligations under all existing refund contracts. Rincon agrees that no such new or additional contracts will be issued. A description of the outstanding contracts and the amounts due thereon shall be provided to the City. Rincon shall notify the City from time to time of the specific amounts required under this Paragraph, which shall be paid by the City within thirty (30) days thereafter.

In *Kugler*, the Supreme Court held the proposed ordinance providing for the setting of salaries of Alhambra's firemen, at no less than the average of salaries received by firemen of the City of Los Angeles and the County of Los Angeles, was not an unlawful delegation of legislative power. The legislative policy was expressed in the ordinance itself, that policy being for wages to Alhambra's firemen to be on a parity with Los Angeles. Alhambra's City Council still retained the responsibility for fixing salaries either at or above that minimum standard.

In discussing the doctrine prohibiting delegation of legislative power, the *Kugler* court stated: "This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler* v. *Yocum*, 69 Cal.2d 371, at pp. 376-377.) Also at page 382: "The proposed Alhambra ordinance contains built-in and automatic protections that serve as safeguards against exploitive consequences from the oper-

---

"24. *Rincon Employees*. The City shall offer employment to all permanent employees of Rincon in job classifications and at rates of pay reasonably comparable to those held by such employees at the time such operational merger occurs. Rincon shall not make any changes in job classifications or rates of pay in anticipation of full operational merger, other than in the ordinary course of business.

"25. *Title to Systems*. Nothing in this Agreement shall affect or transfer title to the water systems owned respectively by Rincon and the City. The City agrees to maintain the Rincon system in good condition and repair, and to provide adequate casualty and liability insurance on such system and the operation thereof. Additions, betterments, extensions made to the Rincon system, and subdivision systems attached to the Rincon system and contributed by the developer, shall be the property of Rincon, subject to operation by the City under the terms of this Agreement. The City shall have the right to make such retirements from the Rincon system as may be appropriate under good engineering practices. The City shall purchase at Rincon's book value all Rincon field supplies, tools, and equipment used in connection with its water system, and such vehicles as Rincon may determine.

"26. *Continued Rincon Functions*. It is recognized that many Rincon landowners and users will probably still remain outside the City upon completion of the operational merger, and it is the responsibility, among others, of Rincon to protect the rights of such landowners and inhabitants under the terms of this Agreement. In addition, it is desirable for Rincon to maintain its water rights in the San Diego County Water Authority and otherwise to help protect the water supply to the Escondido Valley and assist in any way possible in the implementation of this Agreement.

"After full operational merger Rincon shall not construct, install or maintain any water storage, transmission or distribution facilities or provide other services except as above set forth, or as may be agreed upon by the parties. All water service within Rincon shall be rendered by City through its water system and through the Rincon water system pursuant to this Agreement. Rincon shall not transfer title to its water distribution system to any person, or any public or private corporation without the prior written consent of the City."

ation of the proposed ordinance. Los Angeles is no more anxious to pay its firemen exorbitant compensation than is Alhambra.... '[T]he Legislature could reasonably assume that competition...coupled with ...bargaining power...would provide a safeguard against excessive prices....'" And at page 384: "Only in the event of a total abdication of that power, through failure either to render basic policy decisions, or to assure that they are implemented as made, will this court intrude on legislative enactment because it is an 'unlawful delegation'...."

In the present case, the merger agreement itself contains a clear expression of the fundamental policy decision by Rincon, which is to provide the most efficient and economical water service to Rincon at uniform rates for all inhabitants of Escondido Valley, including Rincon. There are sufficient built-in safeguards or standards as required by *Kugler* to assure this policy decision will be implemented and carried out, namely: City promises to assume the obligations of providing "good water service" to all lands and inhabitants within the boundaries of Rincon (see *ante*, § 20); the rates and charges to be adopted by City *must* be uniform and *shall* apply equally within Rincon and the City (see *ante*, § 21); the water rates and charges will not be higher than necessary to raise the amounts required to operate and maintain the integrated system (see *ante*, § 21); the water rates and charges are to be used solely for the purpose of operating and maintaining the integrated water system, and for no other purpose (see *ante*, § 21); City shall not establish any different rates, or conditions of service, applicable to users within Rincon who are located outside City (see *ante*, § 22).

These standards or safeguards as expressed in the merger agreement will avoid any abuse or exploitation of Rincon's inhabitants, and will afford Rincon's board of directors with effective means to control City's performance as operator of the water system in order to achieve the ultimate objective of the agreement.

Hewitts' contention that there will be rates based upon expenses incurred or assumed by City, which have nothing to do with Rincon, assumes a fully integrated single water system will not benefit Rincon or result in improved water service at the lowest cost. This assumption is contrary to the findings of the contracting parties, as expressed in their declaration of intent and the other recitals in the merger agreement.

As pointed out by City, the citizens of Escondido are no more anxious to pay higher water rates than necessary to assure "good water service" than are those Rincon water users who are not citizens of the City.

This same argument was raised in the case of *County of Inyo* v. *Public Utilities Commission* (1980) 26 Cal.3d 154 [161 Cal.Rptr. 172, 604 P.2d 566], at page 158, footnote 2, and the Supreme Court, recognizing that nonresident customers of municipally owned utilities are not without rights to protection against unreasonable and discriminatory water rates or charges, stated at page 159: "[A] city which acquires the water system of another community incurs an obligation to deal fairly with its customers in that community and to provide them with reasonable service at reasonable rates. [Citation.] Such an acquiring city, as to the water dedicated to the use of the outside community, holds 'title as a mere trustee, bound to apply it to the use of those beneficially interested.' [Citation.] Consequently, the county can sue to enjoin rates which are themselves 'unreasonable, unfair, or fraudulently or arbitrarily established' [citation] or which discriminate without a reasonable and proper basis [citation]."

Full operational merger will not reduce Rincon to an "empty shell" nor result in a complete abdication of all its legislative power, as contended by Hewitt. Rincon will still continue to exist as a legal entity with a variety of powers and responsibilities. It still has power to acquire, construct and operate facilities for treatment and disposal of sewage, waste and storm water (Wat. Code, § 71670). It will still provide fire protection (Wat. Code, § 71680) and have authority to operate public recreational facilities (Wat. Code, § 71660). Its board of directors shall still determine the amounts necessary to be raised by taxation during the fiscal year and shall fix tax rates to be levied (Wat. Code, § 72093). Although the rates for water service will in effect be set by City, the board of directors has predetermined by the merger agreement those rates will be at cost and will not exceed the rates charged any other water user in the entire Escondido Valley area. Rincon will retain its membership with the San Diego Water Authority in order to help protect the water supply to Escondido Valley and assist in any possible manner in the implementation of the merger agreement (see *ante*, § 26).

Rincon also retains the power and ability to monitor and enforce the merger agreement to make certain City lives up to its assumed responsi-

bilities, and if a substantial breach of contract occurs, Rincon has appropriate remedies in court.

The decision in *Bagley* v. *City of Manhattan Beach, supra*, 18 Cal.3d 22, does not prohibit delegation of legislative discretionary power unless specifically prohibited by statute. *Bagley* involved Government Code section 36506, which provided cities, by ordinance or resolution, shall fix the compensation of all appointive officers and employees. The Supreme Court held this statutory duty to fix compensation for its employees could not be delegated to arbitrators, stating where the Legislature has made it clear that a legislative body is to exercise discretionary power, the power is in the nature of a public trust and cannot be delegated *except as specifically authorized by statute.* (*Id.*, at p. 24.)

In the present case, Water Code section 71300[2] places all legislative power duties and privileges with the board of directors of Rincon, except for limited permissible delegations authorized by section 71301.[3] However, Water Code sections 71722[4] and 71723[5] specifically authorize Rincon to delegate its power to operate a water works. These sections authorize Rincon to join with any other public agency for the purpose of carrying out any of the district's powers and for this purpose specifically authorizes Rincon to contract with City to carry on its operations. Therefore, there is no legislative intent *limiting* delegability as was true in *Bagley*, but, on the contrary, there is express legislative intent *authorizing* delegability pursuant to these two Water Code sections.

---

[2]Water Code section 71300 reads: "All powers, privileges, and duties of a district shall be exercised and performed by the board."

[3]Water Code section 71301 states: "Any executive, administrative, and ministerial powers may be delegated and redelegated by the board to any of the offices created by this part or by the board."

[4]Water Code section 71722 reads: "A district may join with one or more public agencies, private corporations, or other persons for the purpose of carrying out any of the powers of the district, and for that purpose may contract with such other public agencies, private corporations, or persons to finance acquisitions, constructions and operations."

[5]Water Code section 71723 states: "The contracts with other public agencies, private corporations, or persons may provide for contributions to be made by each party thereto, for the division and apportionment of the expenses of the acquisitions and operations, and for the division and apportionment of the benefits, the services, and products therefrom. Such contracts may also provide for an agency to effect the acquisitions and to carry on the operations, and shall provide in the powers and methods of procedure for such agency the method by which the agency may contract. Such contracts may contain such other and further covenants and agreements as may be necessary or convenient to accomplish the purposes thereof."

The merger agreement is a contract of cooperation by two public agencies who have joined together to form one integrated water system, with each party contributing certain physical assets or property and agreeing to perform certain activities to integrate their respective water systems. Upon full integration or, as the agreement states, "after full operational merger," the combined systems will be operated exclusively by one agency for the benefit of both parties. ■ This is exactly what was intended by the Legislature when it enacted sections 71722 and 71723.

This type of statute is not unusual in California. In construing a similar type of statute entitled "an act providing for the joint exercise of powers by counties, by municipalities, or by municipalities and counties," the California Supreme Court in *City of Oakland* v. *Williams* (1940) 15 Cal.2d 542 [103 P.2d 168], stated at page 549: "The 1921 statute merely provides a procedure whereby this power may be exercised by cooperative action. This type of statute is not unusual in this state. In other instances, the legislature has authorized two or more governmental agencies to contract, whereby one is empowered to perform a governmental function for another. [Citations.] In so legislating the legislature recognizes that there are certain situations and problems that can best be met and solved by several governmental agencies acting jointly and permitting one of their number to act for all."

■ The merger agreement is not fatally defective merely because it does not specify a definite time for its termination. The contract will be construed to continue so long as necessary to carry out the reasonable intentions of the parties. (14 Cal.Jur.3d, Contracts, § 59; *Haggerty* v. *Warner* (1953) 115 Cal.App.2d 468 [252 P.2d 373].)

The trial court determined, if the merger agreement was otherwise valid, it should nevertheless have been approved by a majority of the voters of Rincon as required by Water Code section 71699,[6] and no such approval was sought or obtained.

---

[6]Water Code section 71699 states: "No publicly owned utility shall commence to provide any water service for, on, or to any land within a municipal water district which is subject to (1) the lien of a bonded indebtedness incurred by the district for the purpose of providing a service similar to that which the utility proposes to provide or (2) a lien of an indebtedness arising under any contract between the district and the United States of America incurred or contracted by the district for the purpose of providing water service; provided, that a majority of the voters voting at an election within the district have approved the incurrence of the indebtedness and, provided further, that the district has water available and is ready, able, and willing to serve such land.

"However, a publicly owned utility may commence to provide service, otherwise prohibited, upon either of the following conditions:

This section was enacted in 1970, two years before the merger agreement and, pertinent to this case, provides in substance no publicly owned utility shall commence to provide water service to land within a municipal water district which is subject to an indebtedness incurred to provide similar services without first securing approval of at least a majority of votes from voters at a special election held within the district to be served.

However, the following section 71700[7] provides the exclusive remedy for a violation of section 71699, and *by necessary implication* authorizes commencement of water service contrary to section 71699 by reimbursement to the district serviced of its previously incurred indebtedness.

The obvious intent of the Legislature was to preserve financial integrity and insure repayment of indebtedness incurred to provide water service. █ This has been accomplished by the merger agreement in section 21, which obligates City to service Rincon's Improvement District No. 1 bonds, and Rincon's reimbursement agreements.

Any technical noncompliance with section 71699 would also be cured by the "First Validation Act of 1973." This act is not codified but is found in Statutes of California 1973, chapter 38. It expressly applies to public bodies, including cities and municipal water districts.

Pertinent sections of the act provide: "Sec. 4. All acts...taken by any public body...under color of any law...for the consolidation, merger,

---

"(a) In any portion of such a municipal water district proposed to be served by the publicly owned utility in which the total number of registered voters residing therein is less than 12, and in which the municipal water district (1) receives the written consent of at least a majority of the owners of real property holding at least a majority in value of the real property and (2) consents to the service by resolution.

"(b) In any portion of such a municipal water district proposed to be served by the publicly owned utility in which the total number of registered voters residing therein is 12 or more, and in which at least a majority of the voters voting on the proposition shall have voted at a special municipal water district election to permit such service within that portion of the district. The election shall be called and held within that portion of the district in the same manner as an initiative measure pursuant to Section 71530."

[7]Water Code section 71700 provides: "Any publicly owned utility which commences to provide any water service for, on, or to any land within a municipal water district which is providing service to the land and which land at the commencement of such service is subject to the lien of a bonded or contract indebtedness with revenues pledged for their payment, shall reimburse the district from the water revenues derived from charges made for service to such land, the amount which would have been paid by the district from water revenues for such bond or contract payments."

or dissolution of any public bodies are hereby confirmed, validated, and declared legally effective. . . ."

"Sec. 6. (a) The foregoing provisions of this act shall operate to supply such legislative authorization as may be necessary to validate any such acts and proceedings heretofore taken which the Legislature could have supplied or provided for in the law under which such acts or proceedings were taken.

"(b) The foregoing provisions of this act shall be limited to the validation of acts and proceedings to the extent to which the same can be effectuated under the State and Federal Constitutions."

■ The case decisions recognize the Legislature, by means of validating acts, may subsequently ratify whatever it could have originally authorized so that an act ratified will be equivalent to an act performed under an original grant of power, provided no constitutional obstacles or vested rights are involved. (*Oakdale Irr. Dist.* v. *County of Calaveras* (1955) 133 Cal.App.2d 127, 139 [283 P.2d 732]; *Rock Creek W. Dist.* v. *County of Calaveras* (1955) 133 Cal.App.2d 141, 146 [283 P.2d 740]; *People* ex rel. *Desert etc. Water Dist.* v. *Coachella etc. Water Dist.* (1965) 232 Cal.App.2d 685, 697 [43 Cal.Rptr. 18].)

Validation acts are not limited to correcting procedural irregularities unless expressly so limited (*City of Fairfield* v. *Hutcheon* (1949) 33 Cal.2d 475, 478 [202 P.2d 745]).

■ Since the Legislature could have originally provided what now is necessarily implied by section 71700, namely, that a municipality may commence providing water service to land already located within an existing water district upon payment of its bonded indebtedness without voter approval, such authority is supplied by the 1973 validation act. No vested right or violation of due process is involved.

■ There is no disenfranchisement of the voters of Rincon and no denial of equal protection of the law. The United States Supreme Court in *Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60 [58 L.Ed.2d 292, 99 S.Ct. 383], makes it clear there is no constitutional requirement that extraterritorial extension of the right to vote must accompany extraterritorial extension of municipal powers, it being consistent with equal protection requirements for a government unit to restrict the right to vote to those who reside within its borders. This principle was also rec-

ognized by the California Supreme Court in *County of Inyo* v. *Public Utilities Commission, supra*, 26 Cal.3d 154.

The merger agreement does not substitute the City Council of Escondido for the board of directors of Rincon, as analogized by Hewitt. The Rincon board of directors with its remaining duties and powers is unaffected by the agreement which deals only with the maintenance and operation of the water system. Rincon's board of directors will continue to exist and function by exercising all of its powers except the day-to-day operation of the water system.

Having found the merger agreement is valid pursuant to California case decisions and expressly authorized by the California Water Code, it is not necessary to determine if the agreement is also validated by the Joint Powers Act (Gov. Code, §§ 6500-6515).

Judgment reversed.

Cologne, Acting P. J., and Staniforth, J., concurred.

The petition of plaintiffs and respondents for a hearing by the Supreme Court was denied August 13, 1980.

The United States Supreme Court denied a petition for writ of certiorari on January 12, 1981.