[Civ. No. 22014. Fourth Dist., Div. One. June 2, 1981.]

CARLTON SANTEE CORPORATION, Plaintiff and Appellant, v. PADRE DAM MUNICIPAL WATER DISTRICT et al., Defendants and Respondents.

16

18

COUNSEL

Procopio, Cory, Hargreaves & Savitch and Thomas M. Fiorello for Plaintiff and Appellant.

Jennings, Engstrand & Henrikson and Wallace R. Peck for Defendants and Respondents.

OPINION

**WIENER, J.**—Carlton Santee Corporation (Carlton) appeals from the judgment entered after it unsuccessfully challenged the validity of an ordinance of the Padre Dam Municipal Water District (District) establishing the time of payment and charge to connect a completed dwelling unit for water and sewer services and the fee charged for inspection and engineering. The trial court found that in enacting the ordinance the District did not act in an illegal, arbitrary or capricious manner as the challenged procedures and charges are fair, reasonable and nondiscriminatory in character.

Carlton claims that where Water Code section 71670[1] authorizes the District to charge for services furnished, and where the District has a revolving fund financial policy, the court abused its discretion in refusing to set aside the regulation requiring payment of connection fees possibly years before connections to the District's facilities are actually furnished and in refusing to set aside rules requiring payment of engineering and inspection fees in excess of the cost of providing such services.

 In light of the quasi-legislative nature of the District's actions, its promulgation of the rules in controversy are "reviewable only by means of ordinary mandate (Code Civ. Proc., § 1085) where the court is limited to a determination of whether District's actions were arbi-

[1]All statutory references are to the Water Code unless otherwise specified.

trary, capricious or entirely lacking in evidentiary support, or whether it failed to follow the procedure and give the notices required by law. [Citations.]" (*Swanson* v. *Marin Mun. Water Dist.* (1976) 56 Cal.App.3d 512, 519 [128 Cal.Rptr. 485]; see *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 34, fn. 2 [112 Cal.Rptr. 805, 520 P.2d 29]; *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 727 [135 Cal.Rptr. 588]; *Kahn* v. *East Bay Mun. Util. Dist.* (1974) 41 Cal.App.3d 397, 409 [116 Cal.Rptr. 333].) Upon reviewing the record in its entirety, we conclude the rules are neither arbitrary nor capricious in nature as the reasonableness of the enactments are supported by substantial evidence. (See *City of Santa Cruz* v. *Local Agency Formation Com.* (1978) 76 Cal.App.3d 381, 393 [142 Cal.Rptr. 873].) We affirm the judgment.

*Factual Background*

Carlton owns most of the vacant land within the Santee area, about 2,800 acres located northeasterly of Carlton Hills and the Santee Lakes. It plans to use this land for development of residential projects. It could construct 12,864 dwelling units if it were to build according to the maximum densities allowable. Sewer capacity is only available from the District.

The District is a municipal water district established in 1955 under the Municipal Water District Law of 1911 (div. 20 of the Wat. Code, § 71000 et seq.) and encompasses the San Diego County communities of Santee, Lakeside, Riverview, Flinn Springs, Harbison Canyon, Alpine and a portion of El Cajon. It supplies water, both as a wholesaler and a retailer, and operates a sewage system, a wastewater reclamation plant and recreational facilities at the Santee Lakes. The District is governed by an elected, five-member, board of directors which is responsible for the establishment of the policies and procedures of the District, as well as the management of the entity's 78 employees and assets, having a net book value on June 30, 1978, of about $40 million.

The District is divided into improvement districts of which Improvement District A is the only district involved here. It was formerly the Santee County Water District, an independent agency which was merged into the District on December 31, 1976. Separate financial books and accounting records are maintained for each improvement district, as each depends solely upon its own revenues. Improvement District A supplies approximately 11,000 water services and 11,000

sewer services to a population in excess of 42,000. There is no reliance upon tax revenues for the operation and maintenance of these facilities or for construction of capital improvements. Instead, a variety of fees and charges have been levied for water and sewer use, connections to the respective systems, recreational facilities use, meters, laterals, reinstatement of service, process and approval of tentative maps, engineering, inspection, soil testing, availability letters, and environmental studies.

### Connection Fees

The amount of the connection fee is based upon the District's determination of its average cost in providing sewage treatment plant capacity, sewer trunk lines, water storage facilities, and major water transmission lines to each user. A uniform connection fee of $675 is charged for every residential unit throughout the improvement district. This fee cumulatively represents a $490 water connection fee for each single family residence, which includes a $375 credit to water storage capacity and $115 to water transmission capacity, and $185 sewer connection for each single family dwelling, which includes a $150 credit to sewer plant capacity and $35 to sewer trunk capacity. Originally, the fee was collected when a customer desired the physical connection to the District's facilities. This policy was changed in 1975, however, when the Santee County Water District found itself with insufficient sewer capacity to serve all those desiring service. In 1973 the Regional Water Quality Control Board imposed water discharge requirements on the District resulting in a two-year moratorium on all new connections to the system. In order to secure additional capacity, the Santee County Water District, and later the District, entered into a series of agreements with the City of San Diego to dispose of sewage through the city's facilities. Each of these agreements specified and restricted the amount of sewage which could be discharged. At no time did the allocated capacity equal or exceed the demands upon the system.

This shortage required successive governing boards of the District to balance the parties' respective interests and to devise methods to fairly allocate this essential, finite, resource. Property owners desiring to subdivide and develop their property had to know whether they could proceed with assurance that upon completion of their project, houses could be physically connected to the system. On the other hand, procedures had to be devised which would prevent hoarding and speculating of capacity by large developers who did not immediately intend to un-

dertake their own project but who desired a commitment of capacity. To be fair and nondiscriminatory, capacity had to be made available only to those who were in need and could reasonably guarantee they were prepared to immediately develop their property. At the same time, the District needed funds to plan for and provide the off-site facilities essential to service the subdivisions when they were ready to actually connect. This resulted in the 1975 adoption by the Santee County Water District of new procedures for the allocation of sewer capacity. These procedures required the filing of an application and a minimal filing fee. As capacity became available, applicants were to be so notified in chronological order of their applications. If the applicant wished to proceed at that time, the District agreed to reserve capacity upon the payment of all connection fees attributable to the project. If the applicant did not wish to proceed, the next person on the list was given the opportunity to go ahead. To further assure utilization of the capacity within a reasonable period, physical connection to the system was required within 24 months.

After the merger of the Santee County Water District into the District, the board in 1977 reviewed existing sewer application procedures at a series of public meetings, resulting in the modification of the rules. It retained the requirement that connection fees be paid within two months of date of notification of availability of capacity in order for an application to receive a sewer service commitment from the District. Further, failure to pay such fees constituted a withdrawal of the application, with the capacity then being allocated to the next property owner on the list.

In late 1978, the District negotiated a more extensive agreement with the City of San Diego, securing an augmented capacity sufficient to supply service to approximately 10,472 additional units in Improvement District A. However, at that time, the District had on file approximately 20,529 unsatisfied applications for service to dwelling units. Thus, after an extensive investigation and several public hearings, the board concluded it was necessary to continue the sewer allocation system. It unanimously adopted ordinance No. 79-1 on January 23, 1979, which made certain changes in the existing rules of Improvement District A, but which continued in effect the requirement connection fees be paid within two months of notification of availability of sewer service. An applicant could also elect to defer all or a portion of his application for sewer service provided the applicant delivered written notice of such intent to the District within one month of receipt of the notice of

availability and, where more than five units are being deferred, deposited with the District in cash an amount equal to the multiplication of the number of units times $50. The application then is deemed not withdrawn, but placed on a supplemental list. Upon reinstatement of the application, it has precedence over other pending applications. Such deferred fees are credited against the connection fees charged upon service availability.

On February 2, 1979, notices of availability of sewer capacity were sent to applicants holding priority numbers 198 through 344. Carlton received notices for all of its priority numbers, which included applications for service to 2,910 dwelling units. Each notice summarized the procedures of the District; was accompanied by a copy of ordinance No. 79-1; stated sewer service capacity was available to serve the applicant's property; listed the various deadlines for securing sewer service and the alternative of deferring an application; and provided in pertinent part: "However, you *must* take the following additional steps in order to obtain sewer service. Otherwise your application will not be considered.

"Capacity will be reserved for you upon payment in cash of the full sewer and water connection fees for the subject property within 2 months from the date of this notice if these fees have not been previously paid. If these fees are not paid by *April 2, 1979*, all capacity reserved by the District will become null and void, and your application will be deemed withdrawn and your application fee will be refunded."

Between February 2, 1979, and March 16, 1979, 79 applicants paid connection fees for a total of 1,081 units. On February 23, 1979, Carlton paid $95,175 in connection fees for 141 single family units. Between February 2, 1979, and March 2, 1979, 21 applicants elected to defer their applications for a total of 695 units; however, Carlton did not defer any of its applications. In order to obtain "will serve" letters upon each of its proposed residential projects, Carlton was required to pay $2,964,250 (2,910 x $675) within 60 days of the notices.

On March 13, 1979, the board revised ordinance No. 79-1 by adopting ordinance 79-4 which provided that the $50 per unit application fee and the $50 per unit deferral fee would be refunded by the District if an applicant did not proceed with its project by paying the connection fees when due following notice of the availability of capacity.

*Engineering and Inspection Fees*

The District charges and collects a fee for engineering and inspecting services which is equal to 7 percent of the estimated cost, as determined by the District, of the water and sewer facilities to be installed by the developer. Three percent of this cost is due upon presentation of a proposed map to the District, while the remaining 4 percent is due before approval of the final plans. (Section XII, Rules and Regulations of Padre Dam Municipal Water District, Improvement District A, Water Division, and section XI of the sewer division.) The fee is designed to reimburse the District for services rendered.[2] In 1968, the staff of the Santee County Water District made a study of the costs incurred by the District in performing the various engineering and inspection services for private projects, which were ultimately to be taken over by the District. A comparative study was also made of fees charged by neighboring agencies. Based upon this information, the Board of the Santee County Water District enacted a preliminary fee of $3 per lot and a final fee of 3½ percent of the estimated cost of the facilities. These fees remained in effect until June 1974, when the board was presented with another study reviewing the District's costs and expenses for the cited services during the 1973 calendar year. The study reflected the District was operating at a deficit. Fees of other agencies were again compared. Based upon this evidence, the Santee Board increased the fee to 7 percent. The fee has remained unchanged, as it was continued in effect by the board following the dissolution of the Santee County Water District in late 1976.

---

[2]These services included determining whether the property is within the District and furnishing a letter to that effect to the health department; reviewing with the developer the District's rules, regulations, connection fees, reimbursement agreement forms, subdivision check list procedure and estimated water and sewer construction costs; ordering if necessary, at the expense of the developer, a computer analysis of the water system; conferring with the developer, computer analyst and fire department representatives regarding needed flows and location of fire hydrants; review of tentative maps; preparation by District of layout showing the locations of all lines, valves, fire hydrants, air releases, blowoffs, multiple service branches, wet taps, tie-ins, manholes and clean outs of the needed water and sewer system; review by District of the detailed water and sewer facilities plans prepared by the developer's engineer; review and check of necessary easements; preparation and review of contracts and bonds for installation of facilities; preparation of letter for Department of Real Estate; periodic inspection of job sites and construction work; conferences with the contractor; supervision of repair of facilities; checking of compaction tests and supervision of disinfecting of water lines; and preparation of maps, drawings, contracts, and notices to incorporate facilities into District's administrative and operational system.

*The Trial Court Properly Sustained the*
*Validity of the Connection Fees*

The propriety of "connection" fees for water and sewer services in general is undisputed. (*Associated Homebuilders* v. *City of Livermore* (1961) 56 Cal.2d 847 [17 Cal.Rptr. 5, 366 P.2d 448]; *Harter* v. *Barkley* (1910) 158 Cal. 742, 745 [112 P. 556]; *English Manor Corp.* v. *Vallejo Sanitation & Flood Control Dist.* (1974) 42 Cal.App.3d 996 [117 Cal.Rptr. 315]; *Longridge Estates* v. *City of Los Angeles* (1960) 183 Cal.App.2d 533 [6 Cal.Rptr. 900].) Carlton's challenge is directed solely at the time of payment of such fees, and, if held valid, then the reasonableness of the fee for the issuance of the "will serve" letter.

■ Carlton urges the requirement to pay the connection fees before the connection is furnished to the landowner is contrary to the express language of the enabling statutes which govern and strictly limit the District's functions and powers. (*People* ex rel. *City of Downey* v. *Downey County Water Dist.* (1962) 202 Cal.App.2d 786, 795 [21 Cal.Rptr. 370].) The District is empowered by the Legislature to acquire, control, distribute (§ 71610)[3] and sell water (§ 71611);[4] to acquire, construct and operate sewage facilities (§ 71670);[5] and, to exercise all powers expressly granted by, or necessarily implied from, the Municipal Water District Law, § 71590;[6] *Crawford* v. *Imperial Irrigation Dist.* (1927) 200 Cal. 318, 334 [253 P. 726].) It is authorized to "prescribe, revise, and collect rates or other charges for *the services and facilities furnished* pursuant to this article." (§ 71670; italics supplied.) The

---

[3]Section 71610 provides: "A district may acquire, control, distribute, store, spread, sink, treat, purify, reclaim, recapture, and salvage any water, including sewage and storm waters, for the beneficial use or uses of the district, its inhabitants, or the owners of rights to water in the district."

[4]Section 71611 provides in part: "A district may sell water under its control, without preference, to cities, other public corporations and agencies, and persons, within the district for use within the district."

[5]Section 71670 provides in pertinent part: "A district may acquire, construct, and operate facilities for the collection, treatment, and disposal of sewage, waste, and storm water of the district and its inhabitants.

". . . . . . . . . . . . .

"The district may prescribe, revise, and collect rates or other charges for the services and facilities furnished pursuant to this article."

[6]Section 71590 provides: "A district may exercise the powers which are expressly granted by this division or are necessarily implied."

emphasized phrase appears also in sections 71671[7] and 71672.[8] The thrust of Carlton's argument is that the grammatical use of the past tense within the enabling statutes requires the furnishing of the connection before any charge can be levied.

Preliminarily, contrary to Carlton's assertion, the "connection" fees are for services and facilities furnished in that they secure a firm commitment from the District regarding its financial and physical capability to provide service immediately upon request of the payor. Thus, by accepting payment and granting the application, the District has reserved capacity and has made a legal commitment to provide the facilities for the particular applicant. Further, inherent within the latter are the necessary preparatory tasks of engineering, designing and construction required to make the capacity available.

■ Granted, "[a] prime rule of statutory construction is that words 'should be given their ordinary meaning unless otherwise clearly intended or indicated....' [Citations.]" (*Standard Oil Co.* v. *State Bd. of Equalization* (1974) 39 Cal.App.3d 765, 768 [114 Cal.Rptr. 571], quoting *Estate of Richartz* (1955) 45 Cal.2d 292, 294 [288 P.2d 857].) However, a statute "must be construed in light of its historical background and evident objective." (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263].) Therefore, ""'[t]he fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citations.] Statutes should be construed so as to be given a reasonable result consistent with the legislative purpose.' [Citations.] ... 'The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.'" (*Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 732-733 [114 Cal.Rptr. 460, 523 P.2d 260].)

---

[7]Section 71671 provides: "The revenues from the rates and charges for services and facilities furnished pursuant to this article may be used for the following purposes: (a) To pay the operating and maintenance expenses of the facilities. (b) To provide a reasonable surplus for improvements, extensions, and enlargements. (c) To pay the interest on any bonded debt for the facilities. (d) To provide a sinking or other fund for the payment of the principal of such bonded debt as it becomes due."

[8]Section 71672 provides: "The district may provide that the rates and charges for services and facilities furnished pursuant to this article may be collected with the water rates of the district, that all rates shall be billed upon the same bill and collected as one item, and that in the event of failure to pay the whole or any part of the bill, the district may discontinue any or all service for which the bill is rendered. This section shall not be construed to prohibit the collection of rates or charges by the district in any other lawful manner."

■ Consequently, even if we cast aside our finding the District does in fact furnish a service in committing itself to provide water and sewer services for the applicant's property, we nevertheless conclude the District is authorized to promulgate the rule in question. The District is burdened with the substantial responsibility of securing and expanding sewage facilities and capacities (§§ 71670 and 71671), as well as fairly allocating this vital finite resource for the benefit of the entire populace within the District when faced with a demand greater than the capacity of the system. Inherent within the statutory authority to acquire, construct and operate facilities for treatment and disposal of sewage and waste (§ 71670), is the necessarily implied power (§ 71590) to promulgate regulatory means which guarantee the fair, nondiscriminatory distribution of sewage service based upon need, where the demand exceeds the capacity of the system.

■ Having concluded the board had the legislatively delegated authority to enact the regulatory means in dispute, it must be presumed the board did not act arbitrarily or unreasonably in enacting the ordinance, but that it was "guided by sound discretion and a conscientious and intelligent judgment as to whether the best interests of the district [would] be served . . . ." (*Greeson* v. *Imperial Irr. Dist.* (S.D.Cal. 1931) 55 F.2d 321, 325, affd. 59 F.2d 529; see *Kahn* v. *East Bay Mun. Util. Dist., supra,* 41 Cal.App.3d at pp. 414-415; Evid. Code, § 664.) Because the District constitutes a quasi-municipal corporation (*Hewitt* v. *Rincon del Diablo Municipal Water Dist.* (1980) 107 Cal.App.3d 78, 84 [165 Cal.Rptr. 545]), the validity of an ordinance enacted by the board will be presumed, as the burden of establishing the contrary is upon the challenger. (*Kahn* v. *East Bay Mun. Util. Dist., supra,* 41 Cal. App.3d at p. 414; *City of Industry* v. *Willey* (1970) 11 Cal.App.3d 658, 663 [89 Cal.Rptr. 922]; *Longridge Estates* v. *City of Los Angeles, supra,* 183 Cal.App.2d at p. 539.) "'Every intendment is to be indulged in favor of its validity, . . .'" (*City of Industry* v. *Willey, supra,* 11 Cal. App.3d at p. 663, quoting *Cuthbert* v. *Woodman* (1921) 185 Cal. 43, 45 [195 P. 673]; *Longridge Estates* v. *City of Los Angeles, supra,* 183 Cal.App.2d at p. 539.)

"When the legislature has committed to a municipal body the power to legislate on given subjects or has committed to it judgment or discretion as to matters upon which it is authorized to act, courts . . . have no power to interfere with such a body in the exercise of its legislative or discretionary functions. . . . Whether, in the exercise of legislative powers, a board acts wisely or unwisely is no concern of the courts. They

cannot enter the board room and substitute their judgment for that of the board nor interfere at all with its action unless the board is exceeding its legislative powers, or its judgment or discretion is being fraudulently or corruptly exercised." (*Nickerson* v. *San Bernardino* (1918) 179 Cal. 518, 522-523 [177 P. 465]; see *English Manor Corp.* v. *Vallejo Sanitation & Flood Control Dist., supra*, 42 Cal.App.3d at p. 1003.)

Carlton asserts there exists no case precedent sustaining the validity of requiring payment of connection fees as a prerequisite to commencement of the subdivision process. It urges this financial demand upon the developer is unreasonable as a condition for the acquisition of a "will serve" letter, which must be filed with the County of San Diego to commence the subdivision process. This process necessarily involves the orderly obtaining of approval of the tentative subdivision map, the final subdivision map, and the necessary building permits before construction of the residences and connection to the District's facilities. Carlton explains this process may take years, noting the final map must be obtained within 40 months in order to avoid expiration of the "will serve" letter.

Although we agree with Carlton's analysis of the case precedent offered by the District, the analysis is not necessarily probative of the unreasonableness of the District's requirement in dispute. In *Associated Homebuilders* v. *City of Livermore, supra*, 56 Cal.2d 847, the connection fee was collected, pursuant to a statute which employed the same terminology "for services and facilities furnished," after the landowner applied for a building permit, a condition required far down the road toward completing the subdivision process. In *English Manor Corp.* v. *Vallejo Sanitation & Flood Control Dist., supra*, 42 Cal.App.3d 996, plaintiff alleged a sewer connection fee, authorized by an enabling act employing the same language "services and facilities furnished," was void because it was designed to be only for the privilege of later obtaining services. The court, however, never squarely addressed the matter. Finally, in *Longridge Estates* v. *City of Los Angeles, supra*, 183 Cal. App.2d 533, the city required payment of an "outlet sewer charge" before the final map was recorded, the immediate step required here before obtaining the necessary building permits.

We are aware of the developers' financial burden of securing funds and carrying the necessary notes in order to meet this additional obligation, which proportionately weighs more heavily the larger the

subdivision project involved, especially during these inflationary times within a recessive economy highlighted by skyrocketing interest rates. However, we also appreciate the serious dilemma facing the board regarding the promulgation of an effective, regulatory means of fairly distributing the currently limited resource of sewage treatment capacity to the populace within the District. ■ Whether we would have devised the means in controversy is not the issue; for, "[t]he particular sequence or manner in which such charges . . . [are] fixed (absent some extraordinary situation not here shown) [is] a matter wholly within the legislative discretion of the . . . [Board] and hence beyond the scope of judicial inquiry [citations]." (*Associated Homebuilders* v. *City of Livermore, supra*, 56 Cal.2d at p. 854.)

■ "'The courts have nothing to do with the wisdom or expediency of the measures adopted by an administrative agency to which the formulation and execution of state policy have been entrusted, and will not substitute their judgment or notions of expediency, reasonableness, or wisdom for those which have guided the agency.' [Citations.]" (*Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659].) ■ The requirement of early payment of the connection fees has successfully conserved sewage treatment capacity and provided distribution on an equal, nondiscriminatory and fair basis predicated upon need. Combined with the alternative of deferral of either the entire or merely a portion of the application without losing priority when the application is later activated, we conclude the requirement in controversy is not arbitrary, capricious or unreasonable. It is supported by the evidentiary record.

Carlton's argument the sewer application procedures are inconsistent with the general "revolving fund" financing policy of the District, as set forth in its rules and regulations,[9] and thus are void, is without merit.

---

[9]Section III of the Rules and Regulations of the Padre Dam Municipal Water District, Improvement District A. water division, provides: "The District's policy regarding the financing of capital improvements to the water treatment, storage and distribution system is as follows: When the need for a capital improvement occurs because of the extension of service to new customers, the cost of the required improvements is charged directly to the applicant for the new service which make the improvements necessary. Such costs are collected in the form of a connection fee unless the required improvement is furnished by the applicant. When the need for a capital improvement occurs because of the extention or improvement of service for District customers in general, then the cost of the required improvements is charged to all District customers. Such charges are collected as a part of the District's charge for water service or in the form of property tax."

Further, section III regarding the sewer division provides: "This explanation is pre-

Even assuming the general policy statements are in direct conflict with the time of payment provision within the ordinance, the latter controls. ▆ "A specific provision relating to a particular subject will govern a general provision, even though the general provision standing alone would be broad enough to include the subject to which the specific provision relates. [Citations.]" (*People v. Tanner* (1979) 24 Cal.3d 514, 521 [156 Cal.Rptr. 450, 596 P.2d 328].) Further, where there exists an irreconcilable conflict between two statutory provisions, the later enactment is deemed to have superseded the earlier provision to the extent of inconsistency. (*City of Petaluma v. Pac. Tel. & Tel. Co.* (1955) 44 Cal.2d 284, 288 [282 P.2d 43].)[10]

In the alternative, Carlton argues that even if the connection fee withstands the previous challenges, it is nevertheless void because the amount of the fee is unreasonable. Carlton relies upon a comparison of the $675 charge to the District's annual liability to the City of San Diego of approximately $23.69 per residential unit of sewer capacity and a comparison of the District's estimated expenses for growth and development within Improvement District A between 1979 and 1984 to 1986 with currently held income plus interest over the projected period,

sented here in order that all who are affected by these rules and regulations may understand the fundamental District policies which form the basis for these rules and regulations. [¶] The finances of the District are handled on a revolving fund basis. A bond issue, authorized by voters of the District during 1958, provided funds for the construction of the initial treatment plant, trunk lines and collection lines. [¶] The District has determined its average cost in providing treatment plant capacity, trunk line capacity, collection lines and laterals for a single family dwelling (or equivalent). Each customer who connects to the system is charged a connection fee which represents this average cost to the District in providing facilities to serve him. In effect, he is returning what the District has spent in constructing facilities to serve him. The money can then be used to construct facilities to serve someone else. Thus, the District can expand the system to serve more and more people without repeated bond issues. This saves District property owners many thousands of dollars per year in bond interest."

[10]Carlton's assertion the time of payment provision of the ordinance violated the District's financing policy as set forth in its application forms providing for payment of the fee in effect at the time of connection is unpersuasive. For, the application further provides that it is subject to the rules and regulations of the District and that: "By accepting your application and deposit, the District agrees that it will use its best efforts to allocate its available capacity in the manner described above, but does not represent, promise or guarantee that it will have sufficient capacity to serve your property. The Board of Directors of the District *reserves the right to modify its rules and regulations when it deems it to be in the best interest of the District to do so.*" (Italics added.) In addition, the application form constituted neither a binding contract nor a commitment to serve, but simply a means for securing placement upon the chronological, priority list and an offer by the landowner to purchase a designated amount of sewer treatment capacity governed by the rules and regulations of the District at the time of its acceptance.

allegedly establishing the sufficiency of the latter to offset the former without the need of the immediate collection of the connection fees, totaling in excess of $7 million.

■ It is undisputed the charges must be reasonable, fair and equitable in nature, proportionately representative of the costs incurred by the regulatory, quasi-municipal, water district. (*Associated Homebuilders* v. *City of Livermore, supra,* 56 Cal.2d at pp. 852-853; *United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 165; *Boynton* v. *City of Lakeport Mun. Sewer Dist.* (1972) 28 Cal.App.3d 91, 94-95 [104 Cal.Rptr. 409, 61 A.L.R.3d 1228].) However, in determining the fee, the District "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' . . . ." (*United Business Com.* v. *City of San Diego, supra,* 91 Cal.App.3d at p. 166.)

There is sufficient evidence in support of the trial court's finding of reasonableness regarding the amount of the connection fee. The District is authorized by statute to allocate funds raised from the revenues accumulated from the rates and service charges, not only for operational and maintenance expenses, but also for the development of "a reasonable surplus for improvements, extensions, and enlargements." (§§ 71616 (water) and 71671 (sewer).) The fallacy in Carlton's financial offsetting argument is that it ignores this responsibility in the future. The District's projected developmental needs over the five- to seven-year period for Improvement District A were valued in excess of $14 million. As of June 30, 1978, Improvement District A had accumulated cash of approximately $4.7 million of which approximately $2 million was earmarked for future capital projects. As of February 28, 1979, $78,568 was in its sewer trunk construction fund, $282,847 was in its sewer plant construction fund, $1,304,965 was in its water storage construction fund and $310,270 was in its water transmission lines construction fund. Further, the reportable net income of Improvement District A for the year ending June 30, 1978, was $1,733,548. Of this sum, $876,267 represented the value of contributed assets (i.e., onsite sewer and water lines constructed by private subdividers and donated to the District), leaving a realistic net income of $857,281, of which $211,000 was required to reduce long-term obligations. Consequently, the remaining $646,281 can hardly be construed as an unreasonable annual carry-over or reserve for a system serving over 40,000 people with the cited projected needs and currently held cash assets.

## The Validity of the Engineering and Inspection Fee Was Properly Upheld

Highlighting the District's failure to offer evidence of the annual income and expenses associated with the engineering and inspection fee, Carlton next contends the trial court abused its discretion in refusing to set aside the regulations imposing the fee which allegedly is in excess of the cost of providing such services. The court, more precisely, held Carlton had failed to meet its burden in establishing either the unfair, unreasonable or discriminatory nature of the cited fee, or that it was promulgated by the board in an arbitrary or capricious manner. We agree with this ruling.

■ The individual fees must be reasonable in character, commensurate with the pecuniary burden placed upon the District by the payor. However, there exists a "presumption that the rates, having been fixed by the lawful rate-fixing body, are reasonable, fair and lawful. The burden of overcoming this presumption is on the assailant." (*Boynton* v. *City of Lakeport Mun. Sewer Dist., supra,* 28 Cal.App.3d at p. 95; *Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133, 139 [102 P.2d 759].) Consequently, if the burden is not met, then it is irrelevant whether the District offered any evidence to justify the selection of the fee in controversy. (*Boynton* v. *City of Lakeport Mun. Sewer Dist., supra,* 28 Cal.App.3d at pp. 95-96.)

Carlton failed to overcome the presumption of the validity of the fee. Granted, Carlton filed with the court 11 of the District's accounting sheets summarizing its payment of engineering and inspection fees on 11 specific projects. These sheets reveal Carlton had paid a total of $38,386.36 to the District in pertinent fees on the 11 projects, while the District's total labor cost at the time of trial amounted to only $2,827.68. Compounded by an "overhead" factor of 90 percent charged by the District in order to establish the fee as representative of its costs incurred, Carlton argues the labor and overhead cost amounted to only $5,372.59. However, this evidence is unpersuasive because of lack of foundation and incompleteness. No evidence was offered pertaining to how these records were maintained, their purpose or their completeness. Carlton admits that at least some, if not most, of the projects were not complete as of the time of trial. Further, the evidence ignores the great variety of services performed by the District for the fees.[11] Finally,

---

[11]See footnote 2, *supra.*

Carlton's synopsis of the District's inspectors' respective salaries, although partially probative of the District's overhead, is insufficient by itself or cumulatively with the other proffered evidence to establish the District's total costs involved.

The District established that staff studies had been made in 1968 and again in 1974 when the fee in dispute was enacted. The 1974 study revealed a deficit between the fees collected and the expenditures incurred during 1973 by the District in providing pertinent services. After considering the report, a survey of fees charged by neighboring agencies, and staff recommendations, the board concluded a 7 percent fee was necessary to cover the District's costs. The foregoing combined with the unrebutted presumption of validity compels affirmance of the trial court's ruling, sustaining the validity of the disputed fee.

*Disposition*

The judgment is affirmed.

Cologne, Acting P. J., and Work, J., concurred.