[No. A060031. First Dist., Div. Two. Apr. 18, 1994.]

CHARLES W. BRYDON et al., Plaintiffs and Appellants, v.
EAST BAY MUNICIPAL UTILITY DISTRICT et al., Defendants and
Respondents.

COUNSEL

Berding & Weil and James O. Devereaux for Plaintiffs and Appellants.

Dianne K. Barry, Nancie Ryan and Verna P. Bromley for Defendants and Respondents.

McCormick, Kidman & Behrens, Arthur G. Kidman and Janet R. Morningstar as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**HODGE, J.**\*—Appellants are customers of respondent East Bay Municipal Utility District (the District) who seek to invalidate the water rate structure design enacted by the District in April 1991 as part of a comprehensive drought management program. Appellants petitioned for writ of mandate and sought declaratory and injunctive relief. The petition alleged: (1) the inclining block rate structure at issue constitutes an invalid "special tax" in violation of article XIII A, section 4, of the California Constitution; (2) the adoption of the rate structure was arbitrary, capricious and not rationally related to any legitimate legislative or administrative objective; and, (3) the rate structure unreasonably discriminates against customers "residing in the hot climate areas east of the Berkeley-Oakland hills."

Appellants claim on appeal that the trial court erred in denying the petition and issued an inadequate statement of decision.

### FACTUAL AND PROCEDURAL BACKGROUND

The District is a public agency created pursuant to the Municipal Utility Act (Pub. Util. Code, § 11501 et seq.) and governed by an elected board of directors. The board determines all questions of policy, including the establishment of water rates. (Pub. Util. Code, § 12809.) The District supplies water to over 1,100,000 residents in portions of Alameda and Contra Costa Counties. Ninety-five percent of the District's water supply is obtained from the Mokelumne River's 575-square mile watershed on the western slope of the Sierra Nevada. The District's diversion of this water to the Bay Area occurs at Pardee Reservoir on the Mokelumne River. Further downstream is the Camanche Dam and Reservoir. The combined storage of the Pardee and Camanche reservoirs is approximately 641,000 acre-feet (AF).[1]

Since the District water supply from the Mokelumne River is subject to the entitlements of other users, the District relies on the storage capacity of the two reservoirs to make the river's yield more dependable. Storage in Camanche Reservoir is used to meet the District's downstream obligations, including releases for irrigation, stream flow regulation, flood control, fishery needs, and the senior rights of other riparian and appropriative entitlements.

Storage capacity is essential to the District's operation. In dry years the runoff from the Sierra foothills is less than needed to meet demand and the

---

\*Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judicial Council.

[1]An acre-foot is 43,560 cubic feet. Colloquially, it is an irrigation-based measurement equalling the quantity of water required to cover an acre of land to a depth of one foot.

District must use storage from prior years. In extended critical dry periods such as the historical 1976-1977 drought and the 1986-1992 drought, the existing storage capacity on the Mokelumne River is not sufficient to supply all normal consumptive and in-stream needs.

The District conveys water stored in Pardee Reservoir to the Bay Area through three 82-mile long pipelines. Five terminal reservoirs are maintained within the East Bay. These reservoirs are used: (1) to reregulate the District's Mokelumne River supply in the winter and spring, when Sierra runoff occurs and for uses during the high demand period of the summer months; (2) as emergency standby in case of extended drought or damage to the tunnels, pumping plants, or the aqueducts which cross delta areas that are vulnerable to flooding and earthquakes; (3) to store local runoff; and (4) for environmental and recreational benefits.

Rapid population growth and uncertain climatic conditions have required the District to seek additional sources of water supply. Currently the District has a contract with the United States Bureau of Reclamation for 150,000 AF per year of American River water to be diverted at the Folsom Dam and transported through the Folsom South Canal, the major portion of which has yet to be constructed. The District is required to pay substantial annual fees for maintaining the contract rights to the American River water. Other water supply options include the construction of Bay Area dams and reservoirs and the transfer of American and Mokelumne River water for storage in underground aquifers in San Joaquin County. The various options under consideration are in response to the increasing demands for water. The anticipated costs of these additional sources substantially exceed the costs of present supplies.

From 1986 to 1992, Northern California experienced extreme drought conditions which challenged the capacity of the District to guarantee sufficient water for "human consumption, sanitation, and fire protection." (Water Code, § 350.[2])

On April 9, 1991, the District adopted Resolution No. 32473 which created the "Drought Management Program for 1991." Reciting that "five consecutive dry years have resulted in limited availability of water to meet

---

[2]Water Code section 350 states: "The governing body of a distributor of a public water supply, . . . may declare a water shortage emergency condition to prevail within the area served by such distributor whenever it finds and determines that the ordinary demands and requirements of water consumers cannot be satisfied without depleting the water supply of the distributor to the extent that there would be insufficient water for human consumption, sanitation, and fire protection."

the needs of consumers . . . ," the resolution prohibited enumerated "wasteful uses of water"[3] and further imposed an inclining block rate structure deemed "necessary to conserve the water supply for the greatest public benefit."

An inclining block rate structure imposes higher charges per unit of water as the level of consumption increases. Effective May 1, 1991, the District's inclining block rate structure for single-family residential customers was as follows:

| Gallons Per Day | Price Per CCf-748 Gallons |
| --- | --- |
| 0 to 250 | $ .91 |
| 251 to 750 | .99 |
| 751 to 1,200 | 1.50 |
| Over 1,200 | 3.00 |

Effective June 11, 1991, the rate structure was modified as follows:

| Gallons Per Day | Price Per CCf-748 Gallons |
| --- | --- |
| 0 to 250 | $1.05 |
| 251 to 750 | 1.30 |
| 751 to 1,200 | 1.97 |
| Over 1,200 | 3.94 |

Resolution No. 32473 provided for hardship, health, and safety exceptions for those consumers adversely affected by the rate structure.

In support of the Drought Management Program, Resolution No. 32473 set forth 27 findings, including the following:

"1. For the fifth consecutive year, precipitation and runoff have been below normal in the Mokelumne basin, which produces 95% of the District's water supply. Precipitation as of April 1, 1991 has totalled 27 inches, which is 64% of the amount normally received by this time.

"2. As of April 1, 1991, total water storage in the District's Mokelumne and East Bay Reservoirs is 54% of capacity, compared to 66% of capacity for the same time last year, and 66% of the amount of water stored under average conditions.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3]Prohibited practices included filling decorative lakes and ponds, washing vehicles without using a shut-off nozzle, washing sidewalks, excessive lawn irrigation, etc.

"4. On March 22, 1988, the Board of Directors, acting pursuant to Water Code section 350 *et seq.*, declared a Water Shortage Emergency Condition in light of reports that runoff was projected to be 160,000 AF if conditions after April 1 remained dry. As a result of said Declaration, and in view of data presented concerning availability of water to meet demand, the Board determined that an overall 25% curtailment in total water use (32% for single family residential customers) was required and, in order to achieve this goal, adopted a Drought Management Program which placed restrictions upon the use of water, and which also included revenue-neutral inclining drought rates for all customers. The Program adopted by the Board successfully accomplished the objective it was implemented to achieve, and resulted in a greater than 25% curtailment in overall water use.

"5. On May 9, 1989, in light of evidence that total system storage was only 50% of capacity, total runoff for the 1988-89 water year was projected to be 580,000 AF, and total water storage was projected to be 463,000 AF on September 30, 1989, 162,000 AF less than average, the Board determined that the District's water supply had not been fully replenished, and that the Water Shortage Emergency Condition should continue and a Drought Management Program, including inclining drought rates, be adopted to achieve an overall 15% curtailment (19% for single family residential customers) in total water use. This Program was also successful and resulted in water savings in excess of the 15% goal established by the Board.

"6. On September 12, 1989, based upon information that precipitation and runoff conditions, combined with water savings from the Drought Management Program, would result in the District's water supply on September 30, 1989 being 74% of average, the Board of Directors determined that the water shortage emergency period had ended and adopted a voluntary water conservation program with the objective of reducing water consumption by 15%, which savings would provide a buffer in the event of a fourth dry year.

"7. On February 26, 1991, based upon a thorough review of precipitation and runoff data, as well as projected storage conditions, the Board converted the 15% voluntary conservation program into a 15% mandatory conservation program, and after a duly noticed public hearing, amended the District's regulations regarding water use during this time of shortage.

"· . . . . . . . . . . . . . . . . . . . . . . . . .

"9. In light of data presented by staff concerning availability of water to meet demand, the Board hereby finds that a 15% curtailment in total water

use after May 1, 1991 would help to ensure that sufficient water will be available to meet the needs of the District's consumers in the event of a sixth dry year in 1992 without extreme conservation measures.

"10. The limited success in achieving significant voluntary water conservation in 1987 with a program limited to public information efforts, and demonstrated results from 1977 and 1988-89 mandatory drought management efforts described above, cause the Board to hereby find that an inclining rate structure, in combination with an effective public information program, is necessary to focus public attention on the drought situation, and achieve the desired consumption reduction.

"11. District consumption records regarding water consumption by all single family residential consumers in February, 1986, a very wet month, indicated that a 200 gpd average closely approximated 'interior' uses for 'human needs', and use throughout the District did not vary significantly from this level.

". . . . . . . . . . . . . . . . . . . . . . . .

"13. The Board hereby finds that the use of water in excess of the adjusted winter average of 250 gpd is primarily for uses outside the home, and further finds such uses to be more discretionary in character than 'interior' uses. The Board further finds that the necessary reductions in water use can be achieved by reduction in the demand for water for these exterior uses.

"14. The Board finds that in normal water years, 11% of single family residential customers use more than 750 gpd and account for 35% of all water sold to such customers, and that 3.5% of single family residential customers use more than 1,200 gpd and account for 17% of all water used by such customers.

"15. In order to cover normal District costs, to achieve overall revenue neutrality, and to establish an economic incentive to conserve water for single family residential customers who use between 250 and 750 gpd, the Board hereby finds and determines that a drought surcharge approximately 9% higher than the rate for 250 gpd or less is appropriate and reasonable.

"16. To focus public attention on the water shortage and the need to reduce water usage, and to encourage water conservation by single family residential consumers, the Board hereby finds and determines that an inclining block rate structure calling for a price of $.99 per unit for all water

consumed between 250 and 750 gpd, $1.50 per unit for all water consumed between 750 and 1200 gpd, and $3.00 per unit for all water in excess of 1200 gpd is appropriate and reasonable. This rate structure, in addition to encouraging consumers to conserve water, will help to cover the extraordinary costs of programs required during the drought period, and will tend to meet the Board's goal of revenue neutrality for the entire rate structure. The Board hereby finds that this rate structure treats all single family residential customers equally, and results in customers using the same amount of water being charged the same amount. Further, the Board finds and determines that, on balance, the rate structure is the best alternative among those the Board has considered from the standpoint of attempting to equally allocate the available water, and to achieve the desired water use reduction."

DISCUSSION

I.

*The Inclining Block Rate Structure Does Not*
*Violate the California Constitution*

■ Appellants contend that the inclining block rate structure adopted by the District constitutes a "special tax" prohibited by article XIII A, section 4, of the California Constitution absent two-thirds voter approval. Article XIII A was enacted by the voters in 1978 and is commonly referred to as Proposition 13. It is comprised of four major elements, a real property tax rate limitation (§ 1), a real property assessment limitation (§ 2), a restriction on state taxes (§ 3) and a restriction on local taxes (§ 4). (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 231 [149 Cal.Rptr. 239, 583 P.2d 1281].) These four elements form an interlocking package deemed necessary by the initiative's framers to assure effective real property tax relief. (*Ibid.*)

Section 4 of article XIII A of the State Costitution provides: "Cities, counties, and special districts by a two-thirds vote of the qualified electors of such districts, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district."

Subsequent to article XIII A's passage, the California Legislature enacted enabling legislation at Government Code section 50075 et seq.[4] Section 50075 provides: "It is the intent of the Legislature to provide all cities, counties, and districts with the authority to impose special taxes, pursuant to the provisions of Article XIII A of the California Constitution."

---

[4]All further statutory references are to the Government Code unless otherwise indicated.

Section 50076 provides: "As used in this article 'special tax' shall not include any fee which does not exceed the reasonable cost of providing the service or regulatory activity for which the fee is charged and which is not levied for general revenue purposes."

Section 50077, subdivision (d), provides: "As used in this section 'district' means an agency of the state, formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries."

The District argues that the inclining block rate structure is not a "special tax" and that it is not a "special district" as these terms are defined in the enabling legislation and subsequent judicial interpretation.

### A. *The District is not a "special district."*

In 1982, two decisions of the California Supreme Court substantially illuminated the scope and application of California Constitution, article XIII A, section 4. In *Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197 [182 Cal.Rptr. 324, 643 P.2d 941], the court considered whether the Los Angeles County Transportation Commission (LACTC) could impose a retail transaction and use tax with out the two-thirds majority vote required by article XIII A. Specifically at issue was whether LACTC was a "special district" within the meaning of article XIII A. Finding ambiguity in the terms "special district" and "special taxes," and concerned about the "fundamentally undemocratic nature" of the requirement for an extraordinary (two-thirds) majority, in circumstances where a local majority of the electorate had approved the tax, the majority opinion strictly construed "special districts" to refer to those "which have the power to levy a tax on real property." (*Richmond, supra,* at p. 205.) "The fact 'special districts' are prohibited, even with the consent of two-thirds of the voters, from levying 'ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property' implies that the 'special districts' referred to are those which may levy a tax on real property." (*Richmond, supra,* at p. 205.)

In dissent, Justice Richardson noted that LACTC came precisely within the definition of a "district" under section 50077, and expressed his concern that "[g]overnmental entities may be expected, instinctively, to pour through the opening seeking the creation of similar revenue-generating entities in myriad forms which will be limited only by their ingenuity." (*Los Angeles County Transportation Com.* v. *Richmond, supra,* 31 Cal.3d at p. 213.)

In *City and County of San Francisco* v. *Farrell* (1982) 32 Cal.3d 47 [184 Cal.Rptr. 713, 648 P.2d 935], the issue was "whether a payroll and gross

receipts tax, the proceeds of which are placed into a city's general fund to be used for general governmental expenditures, constitutes a 'special tax' so that a two-thirds vote of the electors is required . . . ." (*Farrell, supra*, at p. 50.)

Again applying rules of strict construction to an ambiguous phrase, the court concluded that the term "special taxes" means "taxes which are levied for a specific purpose rather than . . . a levy placed in the general fund to be utilized for general governmental purposes." (*City and County of San Francisco* v. *Farrell, supra*, 32 Cal.3d at p. 57.)

In *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1 [2 Cal.Rptr.2d 490, 820 P.2d 1000], the Supreme Court revisited both *Richmond* and *Farrell* in response to "a taxation scheme enacted for the apparent purpose of avoiding the supermajority voter approval requirement imposed [by Proposition 13] with respect to any 'special taxes' sought to be imposed by 'cities, counties and special districts.' [Citation omitted.]" (*Rider, supra*, at p. 5.) Confirming the prophecy of Justice Richardson that the Legislature would likely "be importuned successfully by other local entities to grant to them similarly easy escapes from the fiscal constraints of article XIII A" (*Los Angeles County Transportation Com.* v. *Richmond, supra*, 31 Cal.3d at p. 213), the Legislature had created the San Diego County Regional Justice Facility Financing Agency (the agency) with authority to adopt a sales tax, by a simple majority of the county electorate, specifically for the construction of "justice facilities" (i.e., jails and courthouses).

The Supreme Court accepted the express finding of the trial court that the agency " 'was created solely for the purpose of avoiding the strictures of Proposition 13' " and the observation of the Court of Appeal that the agency was an " 'empty shell' " used by the county "to exercise its own fiscal discretion." (*Rider* v. *County of San Diego, supra*, 1 Cal.4th at p. 8.)

Considering "the probable intent" of the framers of California Constitution article XIII A, the court held that " 'special district' would include any local taxing agency created to raise funds for city or county purposes to replace revenues lost by reason of the restrictions of Proposition 13." (*Rider* v. *County of San Diego, supra*, 1 Cal.4th at p. 11.)

We view *Rider* as dispositive. While effectively overruling *Richmond* as to all districts formed subsequent to the adoption of California Constitution, article XIII A in 1978, *Rider* unmistakably carves out an exception for those local agencies which were in existence before 1978 and which lack the power to levy property taxes as a means of replacing the loss of tax revenues

pursuant to article XIII A. (*Rider v. County of San Diego, supra*, 1 Cal.4th at p. 7.) The *Rider* court notes that *Richmond* "makes section 4 inapplicable to special taxes levied by local districts which, *prior to the passage of Proposition 13*, lacked the power to levy real property taxes." (*Rider, supra*, at p. 10, italics added.)[5] Finally, the court observed that the term "special district" was "*unworkable as applied to districts formed after the adoption of Proposition 13 . . . .*" (*Rider, supra*, at p. 11; see also *Hoogasian Flowers, Inc.* v. *State Bd. of Equalization* (1994) 23 Cal.App.4th 1264 [28 Cal.Rptr.2d 686]; *Monterey Peninsula Taxpayers Assn.* v. *County of Monterey* (1992) 8 Cal.App.4th 1520, 1538 [11 Cal.Rptr.2d 188].)

We conclude that the reasoning of *Richmond* as to pre-1978 agencies enjoys the imprimatur of *Rider* and is controlling here. Because the District was formed prior to the passage of Proposition 13, and is not empowered to levy real property taxes, it is not a "special district" as defined in the enabling legislation and the cases interpreting that legislation.[6]

B. *The inclining block rate structure is not a special tax.*

■ Relying on California Constitution, article XIII A, section 4, appellants urge that the inclining block rate structure is a "special tax" rather than a mere "user fee" permitted under section 50076. They contend that the incremental cost imposed on the consumption of more than 250 gallons per day (gpd) is merely punitive and bears no reasonable relationship to the "cost of providing the services or regulatory activity for which the fee is charged." (§ 50076.)

Preliminarily, the District relies upon *City & County of San Francisco* v. *Farrell, supra*, 32 Cal.3d 47, for the proposition that a "special tax" does not encompass a levy whose proceeds are deposited in a general fund without a designated allocation for a specific purpose. Since water rate proceeds are deposited in the general fund for operational, maintenance and recreational activities of the District, it is argued that no "special tax" is implicated.

As with *Richmond*, *Farrell* also must be viewed in light of *Rider*. *Rider* refused to extend the rationale of *Farrell* to those agencies, created after

[5]Justice Mosk in dissent opined that "[i]t is a distortion of *Richmond, supra*, 31 Cal.3d 197, to conclude, as do the majority, that *the case was limited to local entities formed before 1978*, when Proposition 13 was adopted." (*Rider* v. *County of San Diego, supra*, 1 Cal.4th at p. 26, italics added.)

[6]The fact that Public Utilities Code section 13456 authorizes the District to initiate proceedings for the creation of a special district "for sewage disposal or solid waste resource recovery purposes" does not modify our view. Any special districts thus created are to be considered on their own merits in light of *Rider*.

1978, whose only raison d'être was to accomplish funding for a special, designated and limited purpose. In those instances, the contrivance of depositing the tax in the general fund was viewed an insufficient disguise for the real purpose of earmarking those funds for a particular purpose. Regardless of the situs of the deposit, the relevant inquiry under *Rider* is the essential purpose of the levy.

Appellants rely on *Beaumont Investors* v. *Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227 [211 Cal.Rptr. 567] for the proposition that rates which exceed the cost of water delivery (and other connection-related costs) are a special tax, and that the District bears the burden of establishing that its rates are not excessive. In *Beaumont Investors,* the water board imposed a "facilities fee" payable upon application for a connection to its water system. The $60,000 fee was imposed after plaintiffs had executed a water-main extension contract for their 80-unit apartment complex, which fee had therefore not been incorporated into the construction financing. Since both parties agreed that the water district was "within the ambit of Proposition 13," the court perceived the sole issue as whether the facilities fee "exceed[ed] the reasonable cost of constructing the water system improvements" pertaining to the development. The court concluded that the water district had the burden to establish that it fit the "limited statutory exception" of section 50076—that is, that its facilities fee did not exceed the reasonable cost of the service provided, and that to the extent the district had relied upon a study, its failure to make the study a part of the trial court record required a holding that the fee was a "special tax."

In *Beaumont Investors,* the parties either stipulated to or defaulted on those issues most relevant to the instant inquiry. The parties, for example, stipulated that the water district was within the ambit of Proposition 13. They stipulated that the facilities fee could fall within the scope of section 50076. And the water district failed utterly to provide evidence of any reasonable relationship between the cost and the fee. In *Knox* v. *City of Orland* (1992) 4 Cal.4th 132 [14 Cal.Rptr.2d 159, 841 P.2d 144], the Supreme Court cast substantial doubt about the propriety of shifting the burden of proof to the agency. (*Id.,* at pp. 146-147.) For these reasons, *Beaumont Investors* provides limited precedential value for the instant case.

The case of *San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132 [250 Cal.Rptr. 420], however, offers compelling legal analysis in an analogous factual context. There, the court considered the statutory scheme by which the air pollution control district (APCD) was authorized to recover its costs of operation through the imposition of permit fees. At issue were those indirect costs of

operating APCD which could not accurately be attributed to a particular source of pollution. The court held that a rate structure which apportioned costs "among all monitored polluters according to a formula based on the amount of emissions discharged by a stationary pollution source" (*San Diego Gas & Electric Co.*, *supra*, at p. 1135) was not a "special tax" prohibited by California Constitution, article XIII A, section 4. Relying upon *Beaumont Investors*, plaintiffs argued that APCD had not met its burden of demonstrating how the "amount of emissions generated by a pollution source increase[d] the district's indirect costs, . . . ." (*San Diego Gas & Electric Co.*, *supra*, at p. 1147.) While noting that the APCD's methods of cost estimation was not challenged on appeal, the court opined that "[t]here is no reason to require the district to show precisely how more emissions generate more costs to justify the emissions-based apportionment formula. The purpose for the district's existence is to achieve and maintain air quality standards ([Health & Saf. Code] § 40001), thus from an overall perspective it is reasonable to allocate costs based on a premise that the more emissions generated by a pollution source, the greater the regulatory job of the district." (*San Diego Gas & Electric Co.*, *supra*, at pp. 1147-1148, fn. omitted.)

In response to the argument that the emission-based fees thwarted the purpose of Proposition 13, the court commented: "Proposition 13's goal of providing effective property tax relief is not subverted by the increase in fees or the emissions-based apportionment formula. A reasonable way to achieve Proposition 13's goal of tax relief is to shift the costs of controlling stationary sources of pollution from the tax-paying public to the pollution-causing industries themselves . . . ." (*San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.*, *supra*, 203 Cal.App.3d at p. 1148.)

There is a sustainable analogy between the rate structure issue presented in *San Diego Gas & Electric Co.*, and the present case. Just as the regulatory scheme set forth by the APCD was designed to achieve a legislatively mandated ecological objective, so is the inclined block rate structure of the District a response to state-mandated water-resource conservation requirements. Article X, section 2, of the California Constitution provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a

view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. . . ."[7]

As of the enactment of the inclining block rate structure, Water Code section 375 permitted adoption and enforcement of water conservation programs. In 1993, Water Code section 375 was amended to address just those issues currently before this court. As amended, Water Code section 375 provides: "(a) Notwithstanding any other provision of the law, any public entity which supplies water at retail or wholesale for the benefit of persons within the service area or area of jurisdiction of the public entity may, by ordinance or resolution adopted by a majority of the members of the governing body after holding a public hearing upon notice and making appropriate findings of necessity for the adoption of a water conservation program, adopt and enforce a water conservation program, to reduce the quantity of water used by those persons for the purpose of conserving the water supplies of the public entity. [¶] (b) With regard to water delivered for other than agricultural uses, the ordinance or resolution may specifically require the installation of water-saving devices which are designed to reduce water consumption. *The ordinance or resolution may also encourage water conservation through rate structure design.*" (Italics added.)

In pursuing a constitutionally and statutorily mandated conservation program, cost allocations for services provided are to be judged by a standard of reasonableness with some flexibility permitted to account for system-wide complexity. (*San Diego Gas & Electric Co., supra,* 203 Cal.App.3d 1132.)

Moreover, in the present context the constitutional mandate of water conservation contained in article X, section 2 of the California Constitution is at least as compelling as the objectives of article XIII A, section 4. Indeed, even if article XIII A, section 4, is applicable to the instant rate structure, we agree with *San Diego Gas & Electric Co.* court that shifting the costs of environmental degradation from the general public to those most responsible is consistent with the objectives of Proposition 13. The inclining block rate structure is a reasonable reflection of the fact that it is in part the profligate usage of water which compels the initiation of regulated conservation measures, including those public education programs designed to encourage conservation. Intuitively, it can be seen that such measures are necessitated predominately by those citizens least inclined toward conservation. In our view, it is reasonable to allocate rate costs based on the premise that the more unreasonable the water use, "the greater the regulatory job of the district." (*San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at p. 1148.)

---

[7]Water Code section 100 restates article X, section 2 in identical language.

Further, we agree with the observations of *Alamo Rent-a-Car, Inc.* v. *Board of Supervisors* (1990) 221 Cal.App.3d 198, 205-206 [272 Cal.Rptr. 19], that it is an analytical error to conclude "by reverse logic" that if a regulatory fee does not meet the reasonable costs requirements of section 50076 that "it must be a special tax." To the contrary, "[i]f the fee is not the type of exaction which article XIII A was designed to reach, then resort to sections 50075-50077, the enabling legislation for the article, is unnecessary." (*Alamo Rent-a-Car, Inc., supra,* at p. 206.) In short, California Constitution, article XIII A does not apply to every regulatory fee simply because, as applied to one or another of the payor class, the fee is disproportionate to the service rendered.

The inclining block rate structure bears none of the indicia of taxation which California Constitution, article XIII A purported to address. The rate structure was not designed to replace property tax monies lost in consequence of the enactment of California Constitution, article XIII A. The rates were levied against water consumers in accordance with patterns of usage, and at no cost to taxpayers generally. The incremental rate was not compulsory to the extent that any consumer had the option of reducing his or her consumption.

At the time of the enactment of California Constitution, article XIII A, the structure, procedure and standards for utility rate assessment were firmly established. Public Utilities Code section 12809, enacted in 1951, provided, for example, that "[t]he rates and charges for commodities or service furnished by a district shall be fixed by the board. As far as possible utilities shall be self-supporting but the board is not required to fix a rate which in its opinion is unreasonably high, nor to cover by rates large expenditures and the interest thereon required thereon for future needs and developments."

As in *Alamo Rent-a-Car*, the "prior submission of the proposed fee to the voters for approval would be nonsensical." (*Alamo Rent-a-Car, Inc.* v. *Board of Supervisors, supra,* 221 Cal.App.3d at p. 205.) Here, for example, appellants attack only that portion of the rate design which they allege to be "discriminatory" or "disproportionate" as to them. The logic of their complaint, however, applies to the setting of rates of generally. No rate structure is conceivable which would apply with complete fairness to each individual consumer.

Significantly, there is nothing in the legislative history of California Constitution, article XIII A which would remotely suggest an intention to accomplish a wholesale revision of the Public Utilities Code as to ratemaking procedure. Nor can the argument be made that an intended result of article XIII A was to subvert article X, section 2 of the California Constitution which mandates water conservation and precludes "the waste or unreasonable use or unreasonable method of use of water."

As noted above, Water Code section 375 specifically authorizes public utilities to adopt water conservation programs for their consumers and specifically permits the enactment of ordinances to "encourage water conservation through rate structure design." We cannot conclude that California Constitution, article XIII A was intended either by the framers or the electorate to accomplish the essential destruction of the rate setting structure of public utilities, nor the evisceration of constitutional mandates compelling water conservation.

For these reasons, we conclude that the rate structure enacted by the District is not a "special tax" requiring two-thirds voter approval by the local electorate.[8]

## II.

### The Rate Structure Is Not Arbitrary, Capricious, Discriminatory or Lacking in Evidentiary Support

Appellants' remaining claims, (1) that the inclining block rate structure is arbitrary, capricious, and lacking in evidentiary support and not rationally related to any legitimate policy objectives and (2) that the rate structure unreasonably discriminates against certain consumers residing in "hot climate areas" east of the Berkeley-Oakland hills are logically and legally intertwined and will be considered as a single issue.

Appellants adduce the following facts and figures to establish the alleged caprice of the inclining block rate structure. Appellants are single-family residential customers residing in District regions 6 and 7, described as "hot climate areas east of the Berkeley-Oakland hills." During the summers of 1988 and 1989 when drought rates were in effect, single-family residential customers in the region used less than 50 percent of the total water provided to the District's single-family residential customers but paid over 75 percent of the drought surcharges. The penalties had no appreciable effect on water consumption levels, which ran about 30 percent lower than base levels for all District regions which were established in 1986. In response to a related lawsuit filed in Contra Costa County Superior Court (Water v. East Bay Municipal Utility Dist., No. C-88-02986) challenging the 1988-1989 rate structures, the District temporarily suspended the inclining block rate structure. During the summers of 1988 and 1989 single-family residence consumers in region 5 achieved the "nearly identical percentage reductions" as those in regions 6 and 7.

---

[8]Having concluded that the rate structure does not constitute a special tax, we do not reach the District's alternative argument that the rate structure constitutes a permissible special assessment under *Knox* v. *City of Orland, supra,* and the authorities cited therein. (*Knox* v. *City of Orland, supra,* 4 Cal.4th 132, 141.)

During the summer of 1990, without the inclining block rate structure, conservation reduced consumption from the 1986 base level by 29 percent. Nonetheless, on April 9, 1991, the District established a modified drought management program, which included an inclining block rate structure with the objective of achieving a 15 percent water conservation goal as measured against the predrought water usage levels. On June 7, 1991 the District raised the incremental rate. During 1991, conservation increased "marginally" to 34 percent. From June through September 1991, the average summer water usage for single-family residents west of the Berkeley-Oakland hills (during peak periods) ran between 218 to 227 gpd, while in regions 6 and 7 it was 499 to 547 gpd during the same period.

From the foregoing, appellants argue variously that (1) "when [the District's] stated conservation goals are juxtaposed against its customers record of voluntary conservation in the absence of an inclining block rate structure, it is clear that the rates cannot be rationally justified on the basis of promoting conservation"; (2) that the board's "motivation" for the inclining block rate structure was "revenue recoupment" rather than conservation; and (3) that the inclining block rate structure was unreasonable because it is based neither upon the "cost of service" nor upon any other rational basis.

■ Given the quasi-legislative nature of the District's enactment of the rate structure design, review is appropriate only by means of ordinary mandate (Code Civ. Proc., § 1085) where the court " 'is limited to a determination of whether District's actions were arbitrary, capricious or entirely lacking in evidentiary support . . . . [Citations.].' " (*Carlton Santee Corp. v. Padre Dam Mun. Water Dist.* (1981) 120 Cal.App.3d 14, 18-19 [174 Cal.Rptr. 413].) Further, where the District "had the legislatively delegated authority to enact the regulatory means in dispute, it must be presumed the board did not act arbitrarily or unreasonably in enacting the ordinance, but that it was 'guided by sound discretion and a conscientious and intelligent judgment as to whether the best interests of the district [would] be served . . . .' [Citations.] Because the District constitutes a quasi-municipal corporation [citation], the validity of an ordinance enacted by the board will be presumed, as the burden of establishing the contrary is upon the challenger. [Citations.] " 'Every intendment is to be indulged in favor of its validity, . . .' " ' [Citations]." (*Carlton Santee Corp., supra,* at p. 26.)

Such limited review "is grounded on the doctrine of the separation of powers which (1) sanctions the delegation of authority to the agency and (2) acknowledges the presumed expertise of the agency." (*Garrick Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 328 [4 Cal.Rptr.2d 897].)

At the outset, it should be noted that inclining block rates are generally recognized as a conservation measure. In amending Water Code section 375, the Legislature noted that in his April 6, 1992, speech on water policy, California Governor Pete Wilson specifically identified the need to implement water conservation best management practices, including practice No. 11 which provides incentives to water customers to reduce water use through rate structure design. (Stats. 1993, ch. 313, § 1, subds. (f) & (g).) Thus, appellants have the difficult task of demonstrating that the District acted arbitrarily and capriciously in adopting such a measure.[9]

In *Hansen* v. *City of San Buenaventura* (1986) 42 Cal.3d 1172 [233 Cal.Rptr. 22, 729 P.2d 186], the court considered whether an ordinance imposing a 70 percent surcharge on water supplied to customers living outside the city limits was unreasonable, arbitrary and discriminatory. Noting that municipal utilities are entitled to incorporate a reasonable rate of return on investment on rates charged customers (*Hansen, supra,* at p. 1282), the court concluded that a higher rate of return for nonresidents was appropriate since residents bore the responsibility for management of the system, including costs of construction, repair and replacement, and that the property of the residents was subject to lien for various bond issues which had financed the system.

*Hansen* noted that "[a] showing that rates lack uniformity is by itself insufficient to establish that they are unreasonable and hence unlawful. To be objectionable, discrimination must 'draw an unfair line or strike an unfair balance between those in like circumstances having equal rights and privileges. . . . "It is only unjust or unreasonable discrimination which renders a rate or charge unreasonable . . . ." ' [Citation.]" (*Hansen* v. *City of San Buenaventura, supra,* 42 Cal.3d at pp. 1180-1181.)

In *Carlton Santee Corp.,* plaintiff residential developer challenged a requirement that fees for water and sewage connections be paid upon the determination of availability rather than upon the actual furnishing of the service. Under the circumstances of that case, plaintiff was required to make immediate payment of $2.9 million in connection fees notwithstanding that the developer had yet to obtain approval of the tentative subdivision map, the final subdivision map, and the necessary building permits. Again noting the impropriety of courts substituting " ' "their [own] judgment or notions of

---

[9]According to the draft California Water Plan Update "many water conservation specialists think conservation encouraged by water pricing is one of the most important Best Management Practices for reducing water use." (Dept. Water Resources Bull. 160-93, p. 152.)

expediency, reasonableness, or wisdom for those which have guided the agency . . . ," ' " (*Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist., supra,* 120 Cal.App.3d at p. 28) the court upheld the reasonableness both of the timing and amount of the facilities fees charged. Against the challenge that no "service" was provided prior to the physical hookup, the court emphasized the current value of the agency's commitment for future service. "Thus, by accepting payment and granting the application, the district has reserved capacity and has made a legal commitment to provide the facilities for the particular applicant. Further, inherent within the latter are the necessary preparatory tasks of engineering, designing and construction required to make the capacity available." (*Carlton Santee Corp., supra,* at p. 25.)

Significantly, the court found that even if the commitment for a connection could not be considered the furnishing of a service, the district acted reasonably in promulgating the rule. "The district is burdened with the substantial responsibility of securing and expanding sewage facilities and capacities . . . as well as fairly allocating this vital finite resource for the benefit of the entire populace within the District when faced with a demand greater than the capacity of the system. Inherent within the statutory authority to acquire, construct and operate facilities for treatment and disposal of sewage and waste . . . is the necessarily implied power . . . to promulgate regulatory means which guarantee the fair, nondiscriminatory distribution of sewage service based upon need, where the demand exceeds the capacity of the system." (*Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist, supra,* at p. 26.)

While the issue in *Swanson* v. *Marin Mun. Water Dist.* (1976) 56 Cal.App.3d 512 [128 Cal.Rptr. 485] was not the reasonableness of water rates or surcharges, the case demonstrates the expanded scope of authority residing in agencies which regulate the "vital, finite resource" which we consider here. In *Swanson,* the water district concluded, pursuant to the requirements of Water Code section 350, that a "water shortage emergency condition prevailed within the area served by the district" based not upon an immediate emergency, but rather "due to a threatened water shortage." (*Swanson, supra,* at p. 516.) The appeal concerned the district's ordinance, which in response to the threatened shortage, precluded the granting of any new water service where a pipeline extension was required. *Swanson* noted that "[t]he language of section 350 makes it clear that a water district is empowered to anticipate a future water shortage and to impose appropriate regulations and restrictions where, lacking such control, its water supply will become depleted and it will be unable to meet the needs of its consumers." (*Swanson, supra,* at p. 519.) Further, "[s]ection 353 requires that when the board has declared the existence of an emergency condition of water shortage, it shall adopt regulations and restrictions as will, in its sound discretion,

'conserve the water supply' for the greatest public benefit with particular regard to domestic use, sanitation and fire protection. The use of the word 'conserve' implies that a water district is empowered to maintain an appropriate reserve of water to meet future needs and that it need not empty its reservoir before undertaking conservation measures." (*Swanson*, *supra*, at p. 520.)

Relying also upon the language of Water Code section 71640,[10] the court concluded that the resolution and implementing ordinances were reasonable responses of the water district to the threatened water shortage.

We consider the factual allegations of appellants in light of *Hansen*, *Carlton Santee Corp.* and *Swanson*, article X, section 2, of the California Constitution and its correlative statutory authority.

 That the single-family residence customers in regions 6 and 7 used less than 50 percent of the total water provided to the District's single-family consumers but paid over 75 percent of the drought surcharges affords no support to appellants' claim of discrimination. Appellants do not represent the entire population of regions 6 and 7, but merely those who utilized a higher rate of water consumption. In terms of evaluating use patterns, the more interesting statistic is that in normal water years, 89 percent of all single-family residence customers used less than 750 gpd and that the other 11 percent consumed 35 percent of all water sold to single-family residence customers. During the period at issue, only 4.1 percent of all residential customers chose to consume more than 750 gpd.

Appellants' suggestion that the entire population of regions 6 and 7 has been victimized by disproportionate rates which fail to account for peculiar climatic circumstances, is not supported by the record. Only a distinct minority of consumers in regions in 6 and 7 have failed to temper their habits of consumption. Further, indoor water use in regions 6 and 7 exceeded that of the other regions during applicable periods by an average of 30 to 50 percent. It is difficult to see how indoor water consumption is dependent upon the climatic variables of the Bay Area. In the District's view, based upon appropriate data, reasonable water needs throughout the District could be accommodated by water consumption of less than 750 gpd per customer and that water use above that amount was discretionary, and in the context of drought conditions, "excessive."

---

[10]Water Code section 71640 states: "A district may restrict the use of district water during any emergency caused by drought, or other threatened or existing water shortage, and may prohibit the wastage of district water or the use of district water during such periods for any purpose other than household uses or such other restricted uses as the district determines to be necessary. A district may also prohibit use of district water during such periods for specific uses which it finds to be nonessential."

■ None of the statistical arguments of appellants is sufficient to overcome the presumption that the rates are "reasonable, fair and lawful." (*Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist., supra,* 120 Cal.App.3d at p. 31.) Appellants refer to a District report measuring water consumption during peak months (June-Sept.) over several years in comparison with the predrought base year of 1986. In 1989, when the inclining block rate structure was operative, single-family residents conserved 26 percent over the entire district. In 1990, in response to the precursor litigation,[11] implementation of the rate structure was suspended. During the peak periods of 1990, water conservation continued at 29 percent. In 1991, upon reinstitution of the inclining block rate structure, conservation increased to 34 percent. From this data, appellants conclude that there can be no rational relationship between the District's water conservation goals and the inclining block rate structure. However, the data are inappropriate for the analysis. Average rates include the conservation rates of all single-family connections, regardless of their water use. Obviously, inclining block rates will have no effect on conservation by those in the lowest block, and little effect on those in the second block. Relevant data would describe water conservation by those in the higher blocks, not the overall average.

The authority of the District "to promulgate regulatory means" (*Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist., supra,* 120 Cal.App.3d at p. 26) cannot be attenuated by such arbitrary and inconclusive speculation. The temporary cessation of incremental rates was only in response to the precursor litigation and was in the context of a heightened public awareness of the drought and its consequences. Even with appropriate data, the only meaningful statistics as to the effect of the inclining block rate structure would necessarily encompass at least several years of experience, with a careful assessment of an entire array of variables, including the amount and timing of precipitation in relation to growing seasons, the type, tenor and scope of conservation directed toward advertising and informational services, the availability of water conservation implements like reduced-flow faucets, etc. Further, the gravity of the water supply problem presents an opportunity for reasonable experimentation in devising methods to achieve conservation, whether through technological means or behavior modification. The climate of California is not a short term phenomenon. Nor may the District's strategy for conservation be evaluated by reference to a narrow window of time.

Appellants' argument that the inclining block rate structure was designed, not to address drought conditions, but rather to replenish a budget depleted by a pattern of "over conservation" is merely speculative. Again, there is a

---

[11]Water v. East Bay Municipal Utility Dist., *supra,* No. C-88-02986.

"necessarily implied power to promulgate regulatory means" (*Hansen* v. *City of San Buenaventura, supra*, 42 Cal.3d at p. 26) which permits the assimilation of a variety of policy objectives within a particular rate structure. Here, the record demonstrates a rate structure calculated to generate sufficient revenue to meet the District's annual maintenance and operation expenses and the rate funded capital costs and debt service, in order to achieve self-sufficiency. That the structure had the further objective of establishing a disincentive for over consumption does not attenuate the essential reasonableness of its design.[12]

Reiterating the factual basis from which the argument is made that the inclining block rate structure was a "special tax" violative of article XIII A of the California Constitution, appellants urge that "[the District] has not shown . . . that the cost of delivering water above 250 gpd is greater than delivering water below that level of consumption." We note again that the burden of proof of overcoming the presumption of reasonableness is upon "the assailant," (*Carlton Santee Corp.* v. *Padre Dam Mun. Water Dist., supra*, 120 Cal.App.3d at p. 31) and that it is reasonable to conclude that the "regulatory job" of the District is necessarily increased as a response to those consumers least inclined to self regulating temperance. (*San Diego Gas & Electric Co.* v. *San Diego County Air Pollution Control Dist., supra*, 203 Cal.App.3d at pp. 1147-1148.)

Appellants' supposition that the cost of delivering "water above 250 gpd" cannot exceed that of delivering a lesser amount is entirely without foundation. Urban water pricing is a vastly complex mechanism depending greatly upon the source and use of the water.

For example, the cost of diverting water from a river and using it on adjacent lands can be less than $5 AF. The cost of seawater desalinization can exceed $2,000 AF. For now, the District depends upon its Mokelumne River source, but is actively investigating other sources, including the

---

[12]"At least some of the elements of a new generation of resources policies are now taking form. So-called 'green-fees' have received considerable attention in recent years. A prominent example is the proposal to tax energy uses according to the carbon content of the fuel as a means of discouraging carbon dioxide emissions—a major source of concern regarding global climate change. The World Resources Institute has identified an array of charges that would produce environmental benefits and that would also generate considerable revenues for federal, state, and local governments. These include per-bag charges of solid waste disposal, variable toll charges on heavily used roads and highways, charges of toxic releases, water effluent fees, recreation fees in national forests, royalties for hardrock mining on public lands, and full-cost pricing of Bureau of Reclamation—supplied water and timber from national forests." (MacDonnell & Bates, *Natural Resources Policy and Law: Trends and Directions, Rethinking Resources: Reflections on a New Generation of Natural Resources Policy and Law* (1993) Natural Resources Law Center, U. of Colo. School of Law, p. 15, fn. omitted.)

diversion of 150,000 AF annually from the American River. Urban supply systems involve costly facilities for system regulation, treatment plants, distribution systems, and system operations.

In the District's system, those 11 percent of single-family residence consumers who use 35 percent of all water sold to the single-family market are placing a disproportionate strain upon a frail resource. *Swanson* encourages the responsibility of water districts to anticipate future water shortages and to regulate existing supplies accordingly. To the extent that certain consumers overutilize the resource, they contribute disproportionately to the necessity for conservation, and the requirement that the District acquire new sources for the supply of domestic water.

As noted by the Association of California Water Agencies who submitted an *amicus curiae* brief in this case: "In addition to the potential for drought-related shortages, increasing environmental concerns, including water quality, salt water intrusion and the needs of water-dependent wild life have begun to compete with municipal, industrial and agricultural uses for water supplies (*United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 148-152 [227 Cal.Rptr. 161]). Requirements for in-stream uses have further limited supplies available to water agencies to [] augment existing supplies (*National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419 . . . ; *California Trout, Inc.* v. *State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585 . . .). Limited opportunities to augment water supplies make conservation of existing supplies even more critical."

When the District exceeds that margin of safety required to guarantee water for "human consumption, sanitation and fire protection," requiring the declaration of a water shortage supply condition (Wat. Code, § 350) and the regulation and restriction of the delivery and consumption of water (Wat. Code, § 353) it may be argued persuasively that the attendant costs, both in monetary and societal terms, constitute a subsidy borne by the more responsible majority.

Here, the District's multifaceted Drought Management Program was not merely reasonable, but may have been compelled by the mandates of article X, section 2 of the California Constitution and the requirements of Water Code sections 350 and 353, among others.

Article X, section 2 was enacted as an amendment to the California Constitution in 1928, pursuant to an electoral initiative designed to reform California water law. In *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673, 701 [22 P.2d 5], Justice Shenk opined that the amendment represented "the highest and most solemn expression of the people of the state in

behalf of the general welfare. The present and future well-being and prosperity of the state depend upon the conservation of its life-giving waters." Further, "[i]t requires no extraordinary foresight to envision the great and increasing population of the state and its further agricultural and industrial enterprises dependent upon stored water . . . . The conservation of other natural resources is of importance, but the conservation of the waters of the state is of transcendent importance. Its waters are the very life blood of its existence." (*Gin S. Chow, supra,* at p. 702.)

For a time, California Constitution, article X, section 2 and the correlative doctrine of reasonable use lay dormant due in large part to the development of major reclamation projects like the Central Valley Project, the State Water Project, the Hetch Hetchy System of San Francisco and the Owens Valley Project for Los Angeles. For over 40 years, these projects "alleviated most of California's water supply problems," precluding the necessity for judicial involvement in the accommodation of competing water uses. (See Gray, *"In Search of Bigfoot": The Common Law Origins of Article X, Section 2 of the California Constitution* (1989) 17 Hastings Const. L.Q. 225, 269.)

By the 1980's, however, environmental and social circumstances have compelled a dramatic resurgence of the reasonable use doctrine emanating from California Constitution, article X, section 2. First, ". . . it became widely recognized that the statewide demand for water for consumptive purposes was nearing the limits of existing developed supplies." (17 Hastings Const. L.Q., *supra,* at p. 270, fn. omitted.) Second, as exemplified by *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419 [189 Cal.Rptr. 346, 658 P.2d 709], certiorari denied 464 U.S. 977 [78 L.Ed.2d 351, 104 S.Ct. 413] and *United States* v. *State Water Resources Water Control Bd.* (1986) 182 Cal.App.3d 82 [227 Cal.Rptr. 161], considerations of environmental protection have become a major factor in balancing the allocation of water for domestic consumption against public trust requirements such as fisheries, estuarian ecosystems, riparian habitat, and other in-stream uses.

As noted in *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1980) 26 Cal.3d 183, 194 [161 Cal.Rptr. 466, 605 P.2d 1], " '[t]he scope and technical complexity of issues concerning water resource management are unequalled by virtually any other type of activity presented to the courts. What constitutes reasonable water use is dependent upon not only the entire circumstances presented but varies as the current situation changes. As this court noted in *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 140, . . . , "what is a reasonable use of water depends on the circumstances of each case, such an inquiry cannot be resolved *in vacuo* from statewide considerations of transcendent importance." ' (20 Cal.3d at p.

344.)" For these reasons, we suggest that virtually no lawsuit affecting the public regulation of water resources may be viewed without reference to California Constitution, article X, section 2.

In viewing the totality of circumstances pertaining to the instant case, we are impressed by the findings of the District in support of the resolution which adopted the inclining block rate structure. Rather than waiting passively for potentially apocalyptic drought conditions to occur, the District considered the climatic and hydrological conditions, actively pursued other sources of supply, and intelligently developed a drought management program designed to conserve the water supply with the least disruption to domestic, industrial and agricultural consumers. As in *Swanson*, the District "need not empty its reservoir before undertaking conservation measures." (*Swanson* v. *Marin Mun. Water Dist., supra*, 56 Cal.App.3d at p. 520.) And as in *Carlton Santee Corp., supra*, and *Hansen, supra*, we also accord substantial deference to the public agency charged with the responsibility for not only fairly allocating this "vital finite resource" but also for financing the system by which the resource is supplied. As noted in *Hansen*, "reasonableness . . . is the beginning and end of the judicial inquiry." (*Hansen* v. *City of San Buenaventura, supra*, 42 Cal.3d at p. 1181, fn. omitted.)

In our view, the inclining block rate structure is one small and modest component of a well-conceived and eminently reasonable drought management program.

### III.

### *The Trial Court's Statement of Decision Is Adequate*

■ Finally, appellant claims that the superior court failed to adequately articulate the basis for its decision pursuant to section 632 of the Code of Civil Procedure.

Code of Civil Procedure, section 632 provides that "upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial."

"Under section 632, the trial court's statement of decision need do no more than give reasons which state the grounds upon which the judgments rests. . . . A statement of ultimate, not evidentiary, facts is all that has ever been required." (*Republic Indemnity Co.* v. *Empire Builders Corp.* (1985) 167 Cal.App.3d 1163, 1167 [213 Cal.Rptr. 787].)

The trial court's memorandum of decision expressly adopts and incorporates its tentative ruling. The court's memoranda sufficiently address each of the five issues on which appellants had requested a statement of decision. Moreover, appellants waived any complaints about the adequacy of the court's statement of decision since upon the District's submission of a proposed statement of decision, appellants stated: "This court's tentative ruling and memorandum of decision accurately described the court's rulings, and further documentation . . . is unnecessary."

CONCLUSION

The judgment is affirmed.

Kline, P. J., and Smith, J., concurred.

Appellants' petition for review by the Supreme Court was denied July 14, 1994.